**NOT FOR PUBLICATION**                    **[83/84/85/86/88/89]**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
                                        :
EMMARIA GALLIANO, as Administratrix     :    Civil Action No. 03-1463 (FLW)
of the Estate of Dominick Galliano;     :
EMMARIA GALLIANO, as Administratrix     :
of the Estate of Christopher Galliano; and :
MAUREEN SINDT, as Administratrix of     :
the Estate of Gail Galliano,            :
                                        :
              Plaintiffs,               :
                                        :           **OPINION**
        v.                              :
                                        :
BOROUGH OF SEASIDE HEIGHTS;             :
JAMES COSTELLO, individually and in     :
his capacity as Police Chief of the Seaside :
Heights Police Department; TOWNSHIP     :
OF DOVER; COUNTY OF OCEAN;              :
NORMAN A. DOYLE, JR., ESQ.,             :
                                        :
              Defendant.                :
_____ :

**WOLFSON, District Judge**

Presently before the Court are motions by Defendants, Borough of Seaside Heights,

James Costello, Dover Township, and Ocean County[1] seeking Summary Judgment pursuant to

Fed.R.Civ.P. 56, on the Complaint of Plaintiffs Emmaria Galliano, as Administratrix of the

Estate of Dominick and Christopher Galliano and Maureen Sindt, as Adminstratrix of the Estate

of Gail Galliano.[2]   The Plaintiffs have filed a single opposition brief in response to the

---

[1]      The individual Defendants are collectively referred to, when appropriate, as "Defendants."

[2]      Plaintiff Emmaria Galliano, the sister of the late Dominick Gallino and paternal aunt of the late
Christopher Galliano, brings this suit in her capacity as the Administratrix of their respective Estates.  Plaintiff
Maureen Sindt, the first cousin of the late Gail Galliano, brings this suit in her capacity as the Administratrix of Gail
Galliano's Estate.  Plaintiff Emmaria Galliano and Plaintiff Maureen Sindt are collectively referred to herein as
"Plaintiffs".

Defendants' motions.  Defendant Norman A. Doyle, Jr., Esq. also seeks summary judgment

pursuant to Fed.R.Civ.P. 56 in connection with the legal malpractice claims filed by the Plaintiffs

on behalf of the Estate of Christopher Galliano and Plaintiffs have cross-moved.  The Court has

jurisdiction pursuant to 28 U.S.C. 1331, 1343, and 1367.   For the reasons that follow, and for

good cause shown, the motions for summary judgment filed on behalf of Defendants Seaside

Heights, James Costello, and Dover Township are granted in part and denied in part and the

motion for summary judgment filed on behalf of Ocean County is granted.  The motion filed in

connection with the legal malpractice claims against Norman A. Doyle, Jr., Esq. is granted and

Plaintiffs' cross-motion is denied.

## I. BACKGROUND

This action arises out of the tragic murders of Dominick, Gail and Christopher Galliano

by off-duty Seaside Heights police officer Edward Lutes.  Lutes, a seventeen year veteran of the

Seaside Heights Police Department, lived across the street from the Galliano home, in Dover

Township.  See Amended Complaint at ¶¶ 3, 33, 34.  In the spring and summer of 1999, the

Gallianos cared for Lutes' eight-year old daughter in their Toms River home during the hours

that Lutes was on duty.  Id. at ¶ 33.  On March 28, 2000, Lutes' daughter informed him that

Dominick Galliano had exposed himself to her during the time that she was in the Galliano's

care.  Id. at ¶ 38.  Dominick Galliano was thereafter arrested on March 29, 2000, and charged

with various offenses relating to Lutes' daughter's allegations. Id. at ¶ 42.  Dominick Galliano

was indicted on the charges in August 2000, and stood trial before a jury beginning on January 2,

2001.  Id. at ¶¶ 45, 46.  On January 4, 2001, after approximately 45 minutes of deliberation, the

jury determined that Dominick Galliano was not guilty of the offenses charged.  Id. at ¶ 53.

Prior to Dominick Galliano's trial and following his acquittal, Plaintiffs allege that Lutes threatened and harassed the Gallianos on numerous occasions.  Specifically, they point to Gail Galliano's testimony during the January 2001 trial that, in March 2000, Lutes had threatened to shoot Dominick Galliano.  Id. at ¶ 52.  Additionally, they allege that on Halloween of 2001, Lutes urged neighborhood children to throw eggs at the Galliano home, and at the home of Gary Williams, who had testified as a character witness for Dominick during the January, 2001 trial. Id. at ¶¶ 48, 73.  Other alleged incidents of harassment include Lutes' conduct in displaying signs on his lawn or home containing the words "Every dad has his day" and shouting those words from his yard on numerous occasions so that others could hear (Plaintiffs' Stmt. of Material Facts at ¶¶ 361 - 364) and his posting of flyers in the neighborhood accusing Dominick Galliano of being a pedophile.  Id. at ¶ 366.

Additionally, Plaintiffs point to a number of complaints filed with the Dover Township Police Department during 2001 and 2002, in which both the Galliano and the Williams families alleged that Lutes was responsible for incidents of criminal mischief including the slashing of tires on their vehicles (id. at ¶¶ 316, 323, 337),  the throwing of paint on a vehicle (id. at ¶¶ 324) , the throwing of stones into the Williams' pool (id. at ¶¶ 319), and the throwing of dog feces into the Williams' yard (id. at ¶¶ 320).  With regard to most of the incidents alleged, Plaintiffs point out that no reports were filed by the Dover Township Police.  In connection with one of the incidents – the second reported tire slashing by the Williams family – Plaintiffs note that although the investigating officer listed Lutes as a suspect in his report, a Dover Township supervisor later altered the report to remove Lutes' name replacing it with "UNK", representing

"unknown". Id. at ¶ 325.[3]  Additionally, Plaintiffs allege that none of the criminal mischief reports in which Lutes was a suspect were ever referred to the Ocean County Prosecutor's Office, despite a requirement to do so where reports involve allegations of criminal activity by a police officer.[4] Id. at ¶ 325.

The tragic events giving rise to the instant action took place on April 9, 2002, when, shortly after 9:00 p.m., Lutes left his home armed with his police-issued MP-5 submachine gun, entered the Galliano home and fatally shot Dominick Galliano, Gail Galliano, and their son Christopher.  Id. at ¶¶ 397, 398.   Thereafter, Lutes entered the home of the Williams family where he shot and killed Gary and Tina Williams with the MP-5.[5]  Id. at ¶ 403.  Lutes then drove to the Barnegat, New Jersey home of then Seaside Heights Police Chief James Costello.  When Costello exited his home and noticed a gun in Lutes' hand, he ran toward a wooded area behind his house.  Dover Twp. Stmt. of Material Facts at ¶ 46.  Costello sustained three gunshot wounds, but survived.  Id.  Subsequently, Lutes parked is car in the driveway of a home in Barnegat where he fatally shot himself in his car.

---

[3]	Lutes' name did, however, remain in the narrative portion of the report as the person whom Tina Williams thought was responsible for the incident.  Dover Twp. Statement of Material Facts at ¶38.

[4]	Dover Police Chief Mastronardy testified that he became aware of a criminal mischief report containing Lutes' name as he was reviewing reports that came across his desk. Plaintiffs' Stmt. of Material Facts at ¶ 354.  He further testified that he later discussed the report with Seaside Heights Police Chief Costello.  Id. at ¶ 355.  Costello denies that any conversation regarding alleged incidents of criminal mischief ever took place between himself and Mastronardy prior to the April 2002 shootings.  According to Costello, the first time he learned of Lutes' alleged involvement in criminal mischief in Dover Township was when Mastronardy visited Costello in the hospital following the shootings and indicated to him that he had previously informed him of the criminal mischief report.  Id. at ¶ 359.

[5]	An action against the municipal Defendants and Chief Costello was similarly filed in connection with the deaths of Gary and Tina Williams, Docket No. 03-CV-1533, however, the parties to that case reached settlement and the case is now closed.

On the day of the shootings, Lutes had reported to work as usual.  His supervisor, Lieutenant Tate, testified that he appeared happy that day and that Lutes had discussed with him that things were going well with his current fiancé, Ruth Ann Rogan, and that Lutes was looking forward to a new cell phone that was being sent to him in the mail.  Dover Twp. Statement of Material Facts at ¶ 44.  Tate testified that when he learned of what had transpired on the evening of April 9, 2002, he was shocked given Lutes' demeanor on the day of the shootings.

It is undisputed that from the time of his appointment to the Seaside Heights police force in 1986 up until his suicide in 2002, Lutes was considered to be an exemplary police officer. Seaside Heights Stmt. of Material Facts at ¶ 3.  He received consistently excellent evaluations, repeatedly recommending him for promotion.  Id.  In 1991 and 1993, Lutes was named Patrolman of the Year.  Id.  Lutes was six times the recipient of Merit Awards from the PBA following his appointment as a regular police officer, was a certified Firearms Instructor and, in addition to other training, received substantial weapons training.  Id.  Plaintiffs contend, however, that in the months immediately preceding the shootings, Lutes used a significant amount of sick time and compensatory time, which excessive absenteeism was brought to the attention of Chief Costello by Lutes' immediate supervisor, Lieutenant Tate, who reported complaints to Costello by other officers.  Plaintiffs' Stmt. of Material Facts at ¶¶ 346, 347.

Lutes was also a voluntary, part-time member of the Ocean County Central Region Emergency Response Team (the "Central ERT"), which was one of three regional response teams in Ocean County.  Dover Twp. Stmt. of Material Facts at ¶ 8; Ocean County Stmt. of Material Facts at ¶ 38.  The Central ERT operated under the organization and management of a three-member panel of Chiefs of Police, appointed by the Ocean County Prosecutor.  Ocean

County Stmt. of Material Facts at ¶ 40.  Although the Central ERT was designed to be comprised of local emergency services units within Central Ocean County, as of January 1999, the Dover Township Emergency Services Unit (the "Dover ESU") was the only team within the Central Region that met the standard to be recognized as a regional team.  Ocean County Stmt. of Material Facts at ¶ 53.  Lutes often trained with the Dover Township ESU because the Seaside Heights ESU had disbanded due to budgetary constraints and ineffective training facilities.  The Borough of Seaside Heights Police Department approved the purchase of the MP-5 submachine gun for Lutes in connection with his membership in the Central ERT.  Plaintiffs' Stmt. of Material Facts at ¶ 94.  Lutes received specialized training and instruction in the use of the MP-5. Id. at ¶ 100.  Defendants dispute which municipality had direct supervisory responsibility for Lutes in connection with his participation in the Central ERT.  However, it is conceded that Lutes' absences from ERT training during the months of May and June of 2001 could have resulted in his suspension from the Central ERT.  Preliminary Case Review and Consultant Report submitted on behalf of Dover Twp. at p. 8, § 5.0.3.

   In the three years immediately prior to the murders, Lutes' personal life was not quite as uneventful as his professional life.  In July of 1999, he became engaged to Cindy Mansuy who then moved into the home Lutes shared with his daughter, whom he retained primary custody of following a 1991 divorce from her mother.  Dover Twp. Statement of Material Facts ¶ 19.  During that time, Lutes also experienced financial difficulties, filing for personal bankruptcy in October 1999.  Id.

   Lutes and Mansuy appear to have had a somewhat tumultuous relationship.  Dover Twp. Statement of Material Facts ¶ 20.  In November 8, 2000, Lutes reported to the Dover Township

Police Department that Mansuy was intoxicated and was verbally abusing him and his daughter. Id.  Dover Township Patrolman Christopher Licata responded to the call and advised Lutes of his domestic violence rights.  Lutes applied for and received a temporary restraining order.  Id. Patrolman Licata removed Lutes' weapons from the home, and took the weapons to the Borough of Seaside heights Police Department.[6] Id. Lutes' weapons were returned to him the next time he reported to work.  On November 26, 2000, Lutes again called the Dover Township police to report that Mansuy was harassing him.  Id. Dover Township Police Patrolman Laffan responded to the call.  Id. Mansuy was again served with a temporary restraining order.  Id.  Both domestic violence complaints were ultimately dismissed.  Plaintiffs' Stmt. of Material Facts at ¶¶ 167, 170.

On January 18, 2001, approximately two weeks after Dominick Galliano's acquittal, Lutes was issued a summons by Dover Township Police for careless driving after driving his vehicle too fast for conditions, causing his car to slide on ice, cross the curb dividing the roadway, and strike other vehicles.  Plaintiffs' Stmt. of Material Facts at ¶ 197.  According to the driver of one of the vehicles hit by Lutes, Lutes smelled of alcohol and appeared intoxicated.  Id. at 198; Ex. B at GAL01167-68.  The driver reported his observations regarding Lutes' alleged intoxication to the Dover Township officers who had reported to the scene of the accident, but no blood alcohol test or breath test were administered.  Lutes allegedly later confided to a friend that he was indeed intoxicated at the time of the accident but had no fear of being charged because

---

[6]  Despite established procedure in the Dover Township Police Department that required, under the circumstances of Lutes' surrender of his weapons, that a property report be filed, no report was filed and there were no written records maintained by either Seaside Heights or Dover Township regarding the surrender of Lutes' weapons.

"I'm a cop, we take care of each other."  Plaintiffs' Stmt. of Material Facts at ¶ 205; Ex. B at

GAL01133.  Lutes' supervisor, Lieutenant Tate, also testified that Lutes informed him that he

had consumed "a couple of beers" prior to the accident.  Id. at 206; Ex. NN at 66-25 to 68-7.

Shortly thereafter, on February 28, 2001, Mansuy was killed in a motor vehicle accident.

Dover Twp. Stmt. of Material Facts at ¶32.  Lutes was observed consuming alcohol during

Mansuy's wake and was reportedly intoxicated.  Plaintiffs' Stmt. of Material Facts at ¶ 218; Ex.

Q. At 21-19 to 22-2.   During the wake, Lutes was allegedly involved in a heated argument with

one of Mansuy's co-workers who made a derogatory comment to him about his relationship with

Mansuy.  Plaintiffs' Stmt. of Material Facts at ¶ 220.  Members of the Seaside Heights Police

Department, reportedly observed Lutes' behavior at the wake, which included Lutes' use of racial

slurs in response to Mansuy's coworker's comments to him.  Within days of the funeral, Lutes

telephoned Community Medical Center, where Mansuy had been employed, to retrieve her

belongings.  Lutes allegedly made harassing comments to some of the hospital personnel.

Thereafter the head of security at the hospital contacted both the Seaside Heights Police

Department and the Ocean County Prosecutor's Office to complain about Lutes' behavior.

Lieutenant Robert Urie of the Ocean County Prosecutor's office came to Seaside Heights Police

Department to speak to Chief Costello regarding the report of Lutes' threatening conduct.

Costello and Urie spoke to Lutes directly, instructing Lutes not to bother Community Medical

Center personnel again.  Seaside Heights Stmt. of Material Facts at ¶ 16.

In the days following Mansuy's funeral, Seaside Heights police officer Shuldis removed

Lutes' weapons from his home.  It is not entirely clear from the record, but it appears that the

removal occurred immediately following Mansuy's wake, at least in part due to his excessive

8

consumption of alcohol.  Plaintiffs' Stmt. of Material Facts at ¶¶ 227, 228.  Costello and other

Seaside Heights officials, including internal affairs officer Szalkowski, were aware that Lutes'

guns were taken, however, there were no written records maintained with regard to the removal,

nor did Costello request that any written records be prepared.  Plaintiffs' Stmt. of Material Facts

at ¶ 231.  The Seaside Heights Police Department was apparently aware of other instances of

Lutes' substance abuse, reports having been made on several occasions by friends and family

members of Lutes to various members of the Seaside Heights Police Department that Lutes had

an alcohol abuse problem.  Plaintiffs' Stmt. of Mat. Facts at ¶ 239, 240.  Additionally, Lt. Tate

testified that Costello had remarked to him shortly after Mansuy's death, in connection with an

altercation that had occurred between Lutes and Costello's son, a special officer in the Seaside

Heights Police Department, that he was thinking of removing Lutes from the Central ERT

because of his "drinking and taking pills".  However, Lutes was never referred for counseling,

nor was any internal affairs investigation ever initiated.   Plaintiffs' Stmt. of Material Facts at ¶¶

234, 235.

There is some evidence in the record that Dover Township Police Department was also

aware of Lutes' alcohol problem.  Dover Township police officer Louis Sulsenti testified that

sometime prior to April of 2001, Lutes' brother asked him to speak with Lutes about his

drinking.  Plaintiffs' Stmt. of Material Facts at ¶¶ 250 - 256.  Sulsenti subsequently engaged

Lutes in small talk at a Dover Township bar and after observing Lutes' conduct formed an

opinion that Lutes indeed had a drinking problem. Id.   Thereafter, Officer Sulsenti attempted to

file what is known as a hazard report about Lutes.  Id. at ¶ 257.  A hazard report is designed to

warn police officers about a person or a location that might pose a danger to an officer's safety.

Sulsenti was informed by Dover Township Lieutenant Gerding several days later that the hazard report would not be filed.  Id. at ¶ 259.  According to Sulsenti, Gerding informed him that the commander of the Dover Township ESU team, Jeff Kettig, had ordered that the hazard report not be filed.  Id..  Ketting recalled that the only concern raised by Sulsenti was limited to an allegation that Lutes was involved in some sort of altercation with a waitress in a restaurant.  Id. at ¶ 263.  Ketting denied that Gerding had relayed to him any concern about Lutes' consumption of alcohol.  Id.  Gerding testified that he also informed Captain Chaney of the Seaside Heights Police Department of Sulsenti's concern over Lutes' drinking habits.  Id. at ¶ 266.  No other action was taken and Lutes' participation in the Central ERT remained unchanged.

From April 27, 2000 through March 28, 2002, Lutes voluntarily sought psychiatric treatment with Mohamed H. Yosry, M.D., a board certified psychiatrist.  Dover Twp. Stmt. of Material Facts at ¶ 24.  Lutes attended sixteen (16) sessions with Dr. Yosry during which Yosry prescribed the following medications: Fluvoxamine, Clonazapam, Trazodone, Sonata, Celexa, Neurontin, Serzone, Zoloft, Remeron, Paxil and Buspar.  Id.  The Seaside Heights Police Department did not have any policies, procedures, orders, or regulations that addressed the issue of an officer's obligation to report treatment by a mental health professional, and Lutes never notified Seaside Heights of his psychiatric treatement.  Plaintiffs' Stmt. of Material Facts at ¶ 141.  Yosry testified during discovery that he was aware of Mansuy's death, that Lutes had accused Galliano of the sexual assault of his daughter and that he was experiencing financial difficulties, but that he at no time believed Lutes to be a danger to himself or others.  Dover Twp. Stmt. of Material Facts at ¶ 35; Yosry Dep. T19:14-20:4.

10

Aside from the testimony of Gail Galliano at her husband's trial in 2001, there is some testimony in the record that Lutes had verbalized his intention to kill Dominick Galliano. Lutes' sister testified that sometime between March and December of 2001, Lutes invited his sister to go out to a bar with him because he felt the need to kill Dominick Galliano if he remained in the house. Plaintiffs' Stmt. of Material Facts at ¶ 248. Additionally, on April 5, 2002, Lutes, apparently in need of money, sent an e-mail to local businessman Tom Bergstrom requesting to borrow $10,000. In his e-mail, Lutes wrote the following "BUY [sic] THE WAY MY NEIGHBOR WAS THE SCUM BAG THAT ATTEMPTED THE SEXUAL ASSAULT AND YOU CAN REALIZE HOW HARD IT IS TO LIVE NEXT TO HIM WITHOUT KILLING HIM EVEN AFTER HE WAS FOUND NOT GUILTY." Plaintiffs' Stmt. of Material Facts at ¶ 392; Ex. C at OCPO0310 to OCPO0311. Ruth Ann Rogan, Lutes' then fiancé, also testified that Lutes frequently commented that he hated Dominick Galliano and was "going to blow that mother *** brains out." Plaintiffs' Stmt. of Material Facts at ¶ 368; Ex. II, Rogan at 40-17 to 41-15. There is no indication in the record that the Defendants were aware of any of the foregoing statements by Lutes.

The only indication in the record that Defendants Seaside Heights and Costello were indeed aware of Lutes' stated intention to kill the victims stems from the testimony of Seaside Heights police officer, Joseph Minialga. According to Minialga's testimony, two weeks prior to the shootings, Lutes stated in Minialga's presence that he intended to kill Dominick Galliano and Gary Williams. Plaintiffs' Stmt. of Material Facts at ¶ 370. According to Minialga, he immediately reported Lutes' statements to Captain James Chaney, the second in command. Thereafter Chaney and a counselor named George Brogan allegedly discussed the issue with

11

Chief Costello.  Plaintiffs' Stmt. of Material Facts at ¶ 374.  Chaney allegedly sent Lutes to see

Brogan.  Costello denies that he was ever informed of Lutes' alleged statements or that Lutes was

sent to Brogan for evaluation.  Both Chaney and Brogan are deceased and are therefore unable to

corroborate Minialga's testimony.  The only corroboration of Minialga's testimony comes from

former Seaside Heights Deputy Court Administrator, Mary Jo Pisciotta, that while in Chaney's

office shortly before the shootings she witnessed a discussion between Chaney and Brogan that

Costello was advised of Lutes' "deteriorating mental condition."  Plaintiffs' Stmt. of Material

Facts at ¶ 375; Ex. B at GAL01318.

On April 1, 2003, Plaintiffs instituted this action against the Borough of Seaside Heights,

James Costello, individually and in his capacity as Seaside Heights Police Chief, Dover

Township, Ocean County and Norman A. Doyle, Esq. alleging violations of 42 U.S.C. § 1983

(Counts I through IV) and state law claims (Counts V through IX) against the municipal

Defendants and Costello, and malpractice (Count X) against their initial attorney, Doyle.

Plaintiffs later amended the Complaint on April 15, 2004, to include state law claims sounding in

negligence and medical malpractice (Count XI) against Lutes' treating physicians Mohamed H.

Yosry, M.D. and Debbie L. Miller, M.D.  The claims against Yosry and Miller are not the subject

of the instant motions.

## II.  LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine

issue as to any material fact and that the moving party is entitled to a judgment as a matter of

law."  Fed. R. Civ. P. (56)(c); Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A dispute is

"genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-

moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material

only if it might affect the outcome of the suit under the applicable rule of law.  Id.  Disputes over

irrelevant or unnecessary facts will not preclude a grant of summary judgment.  Id.  The burden

of establishing that no "genuine issue" exists is on the party moving for summary judgment.

Celotex, 477 U.S. at 330.  Once the moving party satisfies this initial burden, the non-moving

party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P.

56(e).  To do so, the non-moving party must "do more than simply show that there is some

metaphysical doubt as to material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 586 (1986).

## III.   DISCUSSION

### A.   PLAINTIFFS' CLAIMS UNDER 42 U.S.C. § 1983

42 U.S.C. § 1983 provides a private cause of action against any person who, acting under

color of state law, deprives another of rights, privileges, or immunities secured by the

Constitution or laws of the United States.  The statute, in and of itself, is not a source of

substantive rights but provides "a method for vindicating federal rights elsewhere conferred."[7]

Graham v. Connor, 490 U.S. 386, 393-94 (1989).  The two requisite elements for recovery under

42 U.S.C. § 1983 are: "(1) the conduct complained of must have been done by some person

acting under color of law; and (2) such conduct must have subjected the complainant to the

---

[7]   42 U.S.C. §1983 provides, in pertinent part:
   Every person who, under color of any statute, ordinance, regulation,
   custom, or usage, or any State or Territory, . . . subjects, or causes to be
   subjected, any citizen of the United States or other person within the
   jurisdiction thereof to the deprivation of any rights, privileges, or
   immunities secured by the Constitution and laws, shall be liable to the
   party injured in an action at law, suit in equity, or other proper proceeding
   for redress.

deprivation of rights, privileges or immunities secured to him by the Constitution and laws of the United States." Batista v. Weir, 340 F.2d 74, 79 (3d Cir. 1965); Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995). Thus, in order for a § 1983 claim to survive a motion for summary judgment, the Court must find a genuine issue of material fact as to one of the requisite elements. Coletta v. Board of Freeholders, No. 06-cv-585, 2007 WL 128893 at * 3 (D.N.J. Jan. 12, 2007); Grant v. Cathel, No. 05-cv-3956, 2006 WL 3327886 at * 3 (D.N.J. Nov. 15, 2006).

In Counts I, II, III and IV of Plaintiffs' Amended Complaint, Plaintiffs bring claims under 42 U.S.C. § 1983 against the Borough of Seaside Heights, Seaside Heights Police Chief, James Costello, Dover Township and Ocean County alleging deprivation of the Gallianos' rights under the Fourth, Fifth and Fourteenth Amendments.[8] Defendants seek summary judgment as to the Plaintiffs' § 1983 claims on the grounds that there was no state action or underlying constitutional violation by Defendants that can form the basis for Plaintiffs' claims.

### 1.      Color of State Law

Although Plaintiffs do not bring an action against Lutes directly, they allege that Lutes, "at all times relevant to this action, acted under color of State law." Compl. § 2 (Facts Common to All Counts). Defendants therefore move for summary judgment, at least in part, on the grounds that liability under § 1983 cannot be found because Edward Lutes was not acting under color of state law when he shot and killed Dominick Galliano, Gail Galliano, and Christopher Galliano on April 9, 2002.

---

[8]      Although Plaintiffs allege a deprivation of rights under the Fifth Amendment in their Complaint, Plaintiffs concede that the instant action does not involve any federal action and, therefore, concur with Defendants that there is no viable claim under the due process clause of the Fifth Amendment. (Plaintiffs' Br. at p. 38, n. 6).

"The misuse of power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law is action pursued under color of law within the meaning of 42 U.S.C.A. § 1983." Basista v. Weir, supra, 340 F.2d at 80 (citing United States v. Classic, 313 U.S. 299, 326 (1941); Screws v. United States, 325 U.S. 91, 107-113 (1944)).  The question of what is fairly attributable to the State "is a matter of normative judgment, and the criteria lack rigid simplicity."  Brentwood Acad. v. Tennessee Secondary Sch. Athletic Ass'n, 531 U.S. 288, 295 (2001).

Plaintiffs claim that Lutes' off-duty status during the shootings at issue here does not compel the conclusion that he was not a state actor.  Specifically, Plaintiffs argue that Lutes' "use of a state supplied machine gun in which he was specifically trained by the state, to remedy a perceived failure in the state's criminal justice system, are tangible manifestations of his official authority." (Plaintiffs' Br. at p. 13).  Plaintiffs' claim hinges on the fact that in exacting the shootings, Lutes used "an instrument of his official authority - the MP-5."  Additionally, Plaintiffs cite to the fact that Lutes continued his rampage by traveling to Chief Costello's house, shooting him, and then asking Lieutenant Tate to tell the other Seaside Heights police officers that he did it for them.[9]  Plaintiffs claim that the foregoing is further evidence that Lutes' actions were motivated by and directly related to his police authority.

Thus, according to Plaintiffs, Lutes was carrying out his "perceived duties" when he exacted the killings.  In support of that position, Plaintiffs cite numerous statements by Lutes that the "criminal justice system did not work", "the justice system failed us", "cops don't go to jail",

---

[9]      The Court finds the fact that Lutes shot Costello and his comments in connection therewith irrelevant to the issue of whether he was acting under color of state law at the time that he killed the Gallianos.

"it's gonna be 'suicide by cop'", and "I'm gonna be killed by a cop, one of my own", which were left by Lutes on his home answering machine at some point during his murderous rampage. (Plaintiffs' Br. at 14).  Plaintiffs further cite the rules and regulations of the Seaside Heights Police Department and testimony of Chief Costello that Lutes was cloaked with police authority twenty-four hours a day, seven days a week, and was expected to have his police identification and weapon with him, even when not working a scheduled shift.  (Plaintiffs' Br. at 16).  They also claim that Lutes "clothed himself with the indicia of his authority by wearing a necklace and a ring bearing the [replica] insignia of a badge, even while off-duty, and by having a firearm with him virtually all of the time."  Id.  Plaintiffs argue that Lutes was "on a police mission when he carried out the executions" citing the fact that his sedan was loaded with police weapons, ammunition and equipment, including an Ocean County Regional Swat Team t-shirt, and Seaside Heights police identification and badge and the fact that he was carrying a pair of handcuffs in the front pocket of his shorts.  Id.

The flaw in Plaintiffs' argument is that contrary to their suggestion (Plaintiffs' Br. at 15), Lutes did not "use his authority to punish and bring to justice an offender who had escaped punishment."  Rather, a review of the transcript of the two messages left by Lutes on his home answering machine during the course of the killings reveals the truly personal nature of his conduct:

> It's an emergency hu[sic].  Well guess what, I finally got pushed over the edge.  Had to to what I had to do.  And you know what, I'm continuing on and I'm doing it more.  You don't know where I'm at, but I'm doing it more.  There's gonna be a lot of dead *** bodies all over the *** place.  Everybody had it coming to em, no they're gonna *** get it.  Good-bye.  You know what Ruth Ann.  I always loved you.  Tell my daughter I'm very sorry, but I did this

to protect her.  Cause something had to be done.  I snapped.  I couldn't do it anymore.  But it had to be done.  I couldn't deal with my daughter being violated and this *** scumbag, criminal justice system did not work in the way it's supposed to work and my daughter got the bad end of the stick.  Do you know what, I did this for my daughter.  So [S.], I love you honey.  I did it for you baby.  Please don't ever think bad of daddy.  Daddy done it for you.  Daddy took away these bad *** people for you.  I love you baby.  Please grow up to be a good girl.  You're not gonna see daddy again cause daddy can't go to jail.  Cops don't go to jail.  You're not gonna see daddy again, so please grow up to be a good girl.  And listen to your mommy and please.  Please be with Ruth Ann and, you know, do what she tells you.  And try to do the best you can baby.  I love you so much but I had to do this honey.  I had to do it.  I'm gonna miss you so much.  Daddy will see you up, up in heaven and you'll know why I did it for you.  I love you, bye baby.  [Plaintiffs' Stmt. of Material Facts ¶ 408; Ex. C at OCPO158].

* * *

Yeah it's an emergency.  You can answer the phone right now.  (inaudible).  (inaudible) go out and killed already, but you know what, it's not gonna stop yet.  Until I'm not done.  It's gonna be "suicide by cop".  I'm gonna be killed by a *** cop, one of my own, you believe it.  I'm gonna be killed by a cop, one of my own.  But you know what, all this boils down to what happened to [S.] I *** snapped, you made me snap, you took my *** final snapping point, and you made me snap.  And guess what, I snapped on the right people and I killed the right people.  Everybody that needed to be dead (inaudible) is dead right now.  And guess what, I don't give two ***.  Okay so at least you could do is pick up the phone.  Tell [S.] my love, [S.] baby, my love daddy done it for you.  You know, daddy would never let anybody hurt you.  Somebody hurt you, guess what, daddy had to pay back.  He had to pay back in a bad way.  He had to pay back in a way that you'll probably never see me again.  But he had to pay back.  He had to pay it back.  Cause it couldn't go untouched.  It couldn't go untouched.  It had to be done baby.  It had to be done baby girl.  You know that as well as I do.  People can't just touch you and get away with it.  They're all gonna know or they're not gonna know because they're dead.  But you know what, you live a nice life with your mom and Ruth Ann, please.  You're not gonna see daddy again.  But I want you to grow up to be a big girl.  I want you to grow up to be

17

> (inaudible) little girl and I want you to stay with Ruth Ann and
> mommy.  You know, they'll teach you the right thing.  Daddy had
> to do this honey.  I can't let anybody hurt you.  There were people
> hurt you and the justice system failed us, it failed us.  And I finally
> just had enough and I had to do what I had to do.  And there gotta
> be paybacks.  You know that daddy pays back everything.  And
> there gotta be paybacks.  You know that daddy pays back
> everything.  [Plaintiffs' Stmt. of Material Facts ¶ 408; Ex. C at
> OCPO1587].

The Court finds that Lutes' statements compel a finding that his actions were indeed motivated by revenge that was purely personal in nature.[10]

Plaintiffs assert that despite Lutes' lack of actual authority, he nevertheless acted under color of law based on his conduct in relying on that purported authority to carry out the wrongful conduct.  See e.g., Barna v. City of Perth Amboy, 42 F.3d 809, 816 (3d Cir. 1994)("[O]ne who is without actual authority, but who purports to act according to official power, may also act under color of state law.");  United States v. Giordano, 442 F.3d 30, 43 (2d Cir. 2006)("[I]t is well-established that an official may act under color of law even when he or she encounters the victim outside the conduct of official business and acts for reasons unconnected to his or her office, so long as he or she employs the authority of the state in the commission" of the alleged civil rights violation).

Under the Plaintiffs' theory, then, virtually every off-duty police officer who engages in wrongful conduct using his or her police weapon would have acted under color of state law, a

---

[10]     The Court is not suggesting here that the mere fact that Lutes' conduct was motivated by personal revenge compels a finding that he was not acting under color of state law.  See Barna, supra, 42 F.3d at 816 ("If an individual is possessed of state authority and purports to act under that authority, his action is state action.  It is irrelevant that he might have taken the same action had he acted in a purely private capacity.") Rather, this Court finds that where the conduct was strictly personal in nature and the only evidence of purported state authority is the use of a police issued weapon, there is simply insufficient evidence to find state action.

result which is contrary to the law in this circuit.  While the use of a state-issued weapon or device in the course of wrongful conduct "may" be evidence that the off-duty officer acts under color of law, that alone is not sufficient to cloak the off-duty officer with authority where the use of the weapon occurs in the context of a "clearly personal family dispute."  Barna, supra, 42 F.3d at 809, 818.  Although Plaintiffs assert that Lutes was using his official authority to bring a suspected criminal offender to justice, the evidence compels a contrary conclusion.  Indeed, Lutes expressly stated that the "criminal justice system didn't work."

The out-of-Circuit authority Plaintiffs rely on to support their contention that Lutes acted under color of state law is unpersuasive.  In Revene v. Charles County Comm'rs, 882 F.2d 870 (4th Cir. 1989), for example, the court simply concluded in the context of a motion to dismiss that a deputy sheriff's off-duty status, lack of uniform, and use of his private vehicle when he shot and killed a motorist was not dispositive on the issue of whether the sheriff was acting under color of law.  The Revene Court found dismissal improper based on the facts alleged at "the bare-bones pleading stage."  Id.  Here, where discovery is complete and the only evidence Plaintiffs can point to in support of their contention that Lutes was acting under color of state law is: (1) his use of a state-issued weapon, (2) the regulatory requirement that he have his weapon and identification with him twenty-four hours a day [without evidence that identification was displayed or observed to the victims]; (3) that he wore a necklace and ring bearing a replica insignia of his badge and a Seaside Heights Police Department wristwatch [without evidence that they were observed]; (4) that his private vehicle had other police weapons, ammunition, and equipment [not displayed or observed]; and (5) that he was carrying handcuffs in his front pocket [not displayed or used], the holding in Revene has no applicability.

In Stengel v. Belcher, 522 F.2d 438 (6th Cir. 1975), also cited by Plaintiffs, the Sixth Circuit held that the evidence supported a finding that an officer was acting under color of law where the off-duty, out-of-uniform officer inserted himself into an altercation in a bar and proceeded to use his police-issued mace and pistol to injure the plaintiff.  The Stengel court noted that the evidence permitted an inference that the officer had intervened in the dispute pursuant to a duty imposed by police department regulations[11] and further had been found by his employer to have acted within the line of duty.  Id. at 441.  The facts in Stengel that supported the jury's finding that the officer acted under color of law are simply not present in this case.  While Plaintiffs may assert that Lutes too was cloaked with police authority twenty-four hours a day, the facts of this case are distinct from those in Stengel.  Unlike the officer in Stengle who inserted himself into the situation where department regulations required that he take action or be subject to discipline, here Lutes created the incident himself.

Nor is Plaintiffs' reliance on Bennett v. Pippin, 74 F.3d 578 (5th Cir. 1996) persuasive.  In Bennett, a Sheriff raped an assault suspect after returning to her home following his initial investigation.  Id.  In affirming the district court's finding that the Sheriff was acting under color of law, the Fifth Circuit concluded that the Sheriff's actions "were an abuse of power held uniquely because of a state position . . . and the explicit invocation of governmental authority constituted a 'real nexus' between the duties of Sheriff and the rape."  Id. at 589.   There is simply no nexus here between Lutes' conduct and his duties as a police officer or member of the Central ERT that can support a finding that he was acting under color of law.

---

[11]     The regulation that supported the inference required officers to take action "in any type of police or criminal activity 24 hours a day".  Stengel, supra, 522 F.2d at 441.

Additionally, in <u>United States v. Tarpley</u>, 945 F.2d 806 (5th Cir. 1991), the court considered whether a deputy sheriff was acting under color of law during an assault on his wife's former lover. <u>Id.</u> Despite the deputy's claims that he was acting as a jealous husband, the court found that he had acted under color of law, in part, because he claimed during the assault to have special authority for his actions by virtue of his official status. <u>Id.</u> The court based that determination on a number of factors including the deputy's statements that he could kill the victim because he was an officer of the law, and more importantly, the fact that the deputy called another police officer to the scene and identified him as such and then proceeded with that officer to run the victim out of town. <u>Id.</u>

The facts in this case can hardly be said to rise to the level of those in <u>Tarpley</u>. Other than the use of an official weapon and the fact that Lutes was wearing a replica badge insignia on a necklace and ring at the time of the shootings, there are no other factors indicating that he cloaked himself with authority. The fact that he had police issued weapons in the car and handcuffs in his pocket is of no moment because there is no indication that he referenced them in exacting the killings. Nor are the statements made by Lutes to the effect that the justice system failed him or that cops don't go to jail persuasive on this issue. While Plaintiffs may contend that these statements evidence the fact that Lutes remained mindful of his official authority and the ramifications that might await him if captured while carrying out his "perceived duties", the Court disagrees. Lutes' statements more compellingly demonstrate that Lutes knew he was acting outside the scope of his authority in carrying out the murders. Furthermore, Lutes did not enlist the aid of any other officers as did the deputy in <u>Tarpley</u>.

21

The Plaintiffs' reliance on the fourth circuit decision in Rossignol v. Voorhaar, 316 F.3d 516, 520 (4th Cir.), cert. denied, 540 U.S. 822 (2003) is equally unavailing. In that case, the court found that off-duty sheriff's deputies who participated in mass purchases of a newspaper, which had been critical of the sheriff, deputies and candidates for local office, on the night before the election, acted under color of law. Id. The court concluded that there was a sufficient nexus between the purpose of the mass purchase and the deputies' official roles because they purchased the newspapers to retaliate against those who challenged the performance of official duties and to prevent future criticism. Id. The court noted that the deputies' official identities assisted them in executing the purchase, as store clerks recognized them as deputies, some carried state-issued firearms, and one clerk testified that he was intimidated into selling them the papers. Id. The court concluded that their status as sheriff's deputies enabled the actors to execute their scheme in a manner that private citizens never could have. Id. This case is simply lacking the "sufficiently close nexus" with the State that was present in the Rossignol case.

Finally, Plaintiffs' reliance on McCloughlan v. City of Springfield, 172 F.Supp.2d 1009, 1015 (Cen.D.Ill. 2001) in support of their contention that factual issues relating to whether Lutes was acting under color of law preclude summary judgment is also unavailing. In McCloughlan, the court considered whether an off-duty officer who assaulted a motorist in the parking lot of a tavern was acting under color of law, where the officer did not identify himself as a police officer, did not display a badge, did not display a service revolver, did not display handcuffs, was not in uniform, and did not inform plaintiff that he was under arrest. The McCloughan court concluded that factual issues remained which precluded summary judgment. Unlike the instant case, however, there was indeed evidence in McCloughlan upon which state action could be

found.  Factual issues remained in <u>McCloughlan</u> by virtue of the fact that the off-duty officer was assisting a fellow off-duty officer who had indeed identified himself as an officer during the course of the altercation.  Thus, as in <u>Tarpley</u>, <u>McCloughlan</u> focuses on the involvement of another officer who identified himself as an officer.  Here, Lutes acted alone and there is no evidence upon which a jury could find that Lutes acted in anything other than a personal capacity in exacting the murders.  Thus summary judgment on the issue is appropriate.

Moreover, the facts of this case closely mirror those in <u>Hansell v. City of Atlantic City</u>, 152 F.Supp.2d 589, 609 (D.N.J. 2001), <u>aff'd</u>, 46 Fed.Appx. 665 (3d Cir. 2002) where an off-duty police officer went to the home of his ex-wife, wearing his police-issued bullet proof vest and armed with his police-issued revolver, discharged his revolver to gain entry into the home and proceeded to hold his children and his ex-wife's husband hostage. After noting that plaintiffs could not maintain that the off-duty police officer was acting in the capacity of a state actor while engaged in the incident, despite the use of his state-issued bullet proof vest and service revolver, the <u>Hansell</u> Court remarked, that "[t]he Third Circuit has emphasized that 'if a person's actions 'were not committed in the performance of any actual or pretended duty,' the actions were not committed under color of law.'"  <u>Hansell</u>, <u>supra</u>, 152 F.Supp.2d at 602 n. 6 (<u>quoting</u> <u>Mark v. Borough of Hatboro</u>, 51 F.3d 1137, 1151 (3d Cir.), <u>cert. denied</u>, 516 U.S. 858, 116 S.Ct. 165, 133 L.Ed.2d 107 (1995).  This Court finds that like the off-duty police officer in <u>Hansell</u>, the undisputed facts establish that Lutes' conduct was not taken in the performance of any perceived duty, but was purely private in nature.

While Plaintiffs assert that summary judgment must be denied "[b]ecause there is a strong argument that Lutes acted under color of the law",  Plaintiffs' Br. at 27, Plaintiffs are

23

unable to point to any disputed issues of material fact that would preclude summary judgment. The Court simply does not find that the evidence presented by Plaintiffs raises any issues of fact that would warrant submission to a jury.

### 2.   State-Created Danger

Even in the absence of a finding that Lutes was acting under color of law, the Plaintiffs contend that liability may still be imposed on the municipal Defendants[12] because they have stated a Fourteenth Amendment Due Process claim under the "state-created danger" doctrine.[13] "Generally, the Due Process Clause does not impose an affirmative obligation on the state to protect its citizens."  Kaucher v. County of Bucks, 455 F.3d 418, 431 (3d Cir. 2006). However, the "state-created danger" theory of liability is a recognized exception to the general rule. "Under the state created danger doctrine, a state actor violates the Due Process Clause when he creates a danger to an individual or renders the individual more vulnerable to danger than he would have been in the absence of state intervention."  Soberal v. City of Jersey City, No. 04-cv-2788, 2006 WL 2085397 at * 7 (D.N.J. July 25, 2006)(citing Bright v. Westmoreland County, 443 F.3d 276, 281 (3d Cir. 2006).

The "state-created danger" theory has its genesis in the Supreme Court's decision in DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d

---

[12]        Plaintiffs bring claims against Costello in both his individual and official capacities.  Section C of this opinion addresses the § 1983 individual capacity claims against Costello.  The § 1983 official capacity claims against Costello are, effectively, identical to the § 1983 claims against Seaside Heights, which are addressed herein. See A.M. ex rel. J.M.K. v. Luzerne County Juvenile Det. Ctr., 372 F.3d 572, 581(3d Cir. 2004)("A suit against a governmental official in his or her official capacity is treated as a suit against the governmental entity itself.").

[13]        Plaintiffs appear to concede that in the absence of a finding that Lutes was acting under color of law, their claims against the municipal Defendants and Costello based upon a violation of the Gallianos' rights under the Fourth Amendment will fail.  Plaintiffs' Br. at 12.

249 (1989).  Under the state-created danger doctrine, a state "may assume responsibility for the safety of an individual for whom it affirmatively creates or enhances a risk of danger."  Kaucher v. County of Bucks, supra, 455 F.3d at 431.  To state a meritorious substantive due process claim under the doctrine, the Third Circuit has determined that the following essential elements must be met:

> (1) the harm ultimately caused was foreseeable and fairly direct;
>
> (2) a state actor acted with a degree of culpability that shocks the conscience;
>
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
>
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all. [Id.]

Defendants claim that Plaintiffs have failed to satisfy the foregoing elements.  For the following reasons, the Court finds there are genuine issues of material fact, which preclude the grant of summary judgment on Plaintiffs' § 1983 claims based upon the state created danger theory of liability.

### a.  Foreseeable Harm

The first element under the state-created danger doctrine requires a plaintiff to establish that the "harm ultimately caused was foreseeable and fairly direct."  Id. at 431.  Plaintiffs contend that it is well-recognized that acts of misconduct by police officers, both on and off-duty, are foreseeable and that practices such as proper supervision, training and discipline can and do serve

to diminish the likelihood and frequency of officer misconduct. Plaintiffs' Br. at p. 42. Pointing to the facts known to each of the Defendants, Plaintiffs argue that there are indeed sufficient facts upon which this Court should find the issue of foreseeability is one for the jury.

With regard to Seaside Heights, Plaintiffs contend that Minialga's deposition testimony, that he conveyed to Captain Chaney, the department's second in command, Lutes' report that he was going to kill Dominick Galliano, standing alone provides sufficient evidence to support a finding of foreseeability as to Seaside Heights. When that testimony is considered in tandem with the other evidence of which Seaside Heights was aware, including Chief Mastronardy's call to Chief Costello advising him of Lutes' involvement in a criminal mischief matter in Dover Township[14], reports of Lutes' drinking problems to various members of the Seaside Heights Police Department, including a police supervisor, and Lutes absenteeism in the months preceding the shootings, Plaintiffs argue that a jury may properly find that Lutes' actions against the Gallianos were foreseeable as to both Seaside Heights and Costello. This Court agrees that based upon the facts and inferences that must be decided in Plaintiffs' favor on this motion, a jury could find the harm to the Galliano family foreseeable in light of the failure to take proper evaluative action with respect to Lutes' fitness to possess the MP-5 and other state-issued firearms.

With regard to Dover Township, the Plaintiffs argue that the evidence of foreseeability is equally compelling. Plaintiffs point to the deposition testimony of Dover Township Officer Sulsenti that he attempted to file the hazard report identifying Lutes as a danger to officers due to

---

[14]      Chief Costello denies that Chief Mastronardy informed him of the incident prior to the April 2002 shootings, however, any dispute in this regard creates an issue of material fact which precludes the grant of summary judgment.

his alcohol abuse and access to high-powered weapons, but was instructed by his superiors that the report would not be filed.  Additionally, Plaintiffs point to the fact that (1) Dover officers in charge of the Central ERT took no adverse action despite Lutes' absences from mandatory training sessions; (2) Dover officers were aware of allegations by the Williams and Gallianos through their criminal mischief complaints that Lutes was targeting them for retribution; (3) Chief Mastronardy was aware that Lutes was listed as a suspect in a criminal mischief matter in Dover Township[15]; (4) Dover officers were aware of the criminal allegations made by Lutes' daughter against Dominick Galliano; and (5) Dover officers were aware of the projections on Lutes' house proclaiming that "every dad has his day".  In connection with the incidents involving the hazard report and the removal of Lutes' name from a criminal mischief report, Plaintiffs further argue that Dover Township affirmatively squelched attempts to warn others that Lutes was a danger.  The Court finds that while the issue of foreseeability of harm to the Gallianos may be a close one with respect to Dover Township, Plaintiffs have presented sufficient evidence to require submission of the issue to the jury.  Indeed, it is the fact-finder's duty to weigh this evidence.  Hill v. City of Scranton, 411 F.3d 118, 125 (3d Cir. 2005).

Plaintiffs' claims regarding Ocean County are less than compelling.  Plaintiffs assert that Ocean County created a duty to supervise Lutes when it created the Central ERT.  By appointing Dover Township as the "nucleus of the county's central regional tactical team", Plaintiffs argue that Dover Township was its agent in connection with all matters related to the operation of the Central ERT and is therefore chargeable with all knowledge about Lutes attributable to Dover

---

[15]     As previously noted, there is clearly a disputed issue of material fact regarding whether Mastronardy ever communicated to Chief Costello that Lutes had been named as a suspect in a report involving criminal mischief.

Township.  Plaintiffs' Br. at 46.  Moreover, Plaintiffs argue that the County received attendance reports in connection with mandatory training sessions and that knowledge of Lutes' faltering attendance is therefore attributable to Ocean County as well.  Plaintiffs also point to Ocean County's knowledge of the harassing comments made by Lutes toward employees of Community Medical Center following the death of his fiancé in February 2001.  Finally, Plaintiffs cite to the fact that the "County's agents" (presumably the prosecutor and the sheriff's officers) were aware of Gail Galliano's testimony at the 2001 trial of her husband that Lutes had threatened Dominick. Only this last fact connects the decedents with Lutes.  Viewing the facts and inferences in the light most favorable to Plaintiffs, this Court disagrees that a reasonable jury could find that the harm likely to befall the Gallianos was foreseeable if Ocean County failed to take evaluative action in connection with the scant evidence alleged.[16]

### b.  Action that Shocks the Conscience

With regard to the second factor, the Third Circuit has recently attempted to clarify the standard of culpability in substantive due process cases in Sanford v. Stiles, 456 F.3d 298, 309 (3d Cir. 2006) where it held that "in any state-created danger case, the actor's behavior must always shock the conscience."  The Court went on to hold that "[t]he level of culpability required to shock the conscience increases as the time state actors have to deliberate decreases.  In a 'hyperpressurized environment,' an intent to cause harm is usually required.  On the other hand, in cases where deliberation is possible and officials have the time to make 'unhurried

---

[16]      Because this Court finds that Plaintiffs have failed to establish the first element of the state created danger test with respect to the allegations against Ocean County, and because the Court finds, infra, that Ocean County is entitled to summary judgment on the grounds that Ocean County may not be held liable for the conduct of the Prosecutor's Office or the Sheriff's Office in connection with claims involving the failure to supervise and discipline Lutes, the Court declines to determine whether Plaintiffs have established the remaining three elements of the state-created danger test as to Ocean County.

judgments,' deliberate indifference is sufficient." Id.  Our circuit has recognized that there are situations where a "split-second" decision may not be required, but something more than "unhurried judgment" is necessary.  Id.  Under those circumstances, the Third Circuit has concluded that the defendants must be found to have "disregard[ed] a great risk of serious harm." Id. at 310.  Although the parties here disagree as to which standard applies, this Court will accept for the purposes of the instant motion, that deliberate indifference on the part of Defendants is sufficient to establish the conscience-shocking level of culpability required to establish culpability.  As Plaintiffs note, the Defendants here clearly had the luxury of an unhurried, non-emergency process of thoughtful deliberation in connection with Lutes' conduct over a number of months.

The Court finds that the same evidence that supports a finding as to the first element of the state-created danger doctrine, regarding the foreseeability of harm in the absence of evaluative action, supports a finding as to deliberate indifference on the part of Seaside Heights, Chief Costello and Dover Township.  This Court recognizes that mere negligence is not enough to shock the conscience, see County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998)(finding negligently inflicted harm categorically beneath threshold of constitutional due process), but finds that, on this motion for summary judgment,  the evidence may rise to the level of deliberate indifference based upon the numerous incidents alleged that should have alerted Defendants Seaside Heights, Costello and Dover Township of the need to take evaluative action in connection with Lutes' continued possession of state-issued weapons, particularly the MP-5 submachine gun to which he was given unfettered access.

### c.     The Decedents Were Foreseeable Victims

The third factor of the state-created danger theory requires there to be "some relationship between the state and the plaintiff."  Morse v. Lower Merion School District, 132 F.3d 902, 912. "The plaintiff must be 'a member of a discrete class of persons subjected to the potential harm brought about by the state's actions,' as opposed to a member of the public in general."  Walter v. Pike County, 465 F.Supp.2d 409, 421-22 (M.D.Pa. 2006)(quoting Morse, supra, 132 F.3d at 912).  The Court finds that Plaintiffs have established sufficient evidence upon which a jury could find the requisite "special relationship."  In DeShaney, supra, 489 U.S. at 200, the Supreme Court explained the requisite relationship as follows:

> When the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs – e.g. food, clothing, shelter, medical care, and reasonable safety – it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause.

Plaintiffs have presented sufficient evidence to support a finding that Seaside Heights, Chief Costello and Dover Township were aware of the potential danger Lutes posed to the Gallianos.  With regard to Seaside Heights and Chief Costello, the Court finds Minialga's deposition testimony alone sufficient to satisfy the third element of the state-created danger test. If the jury finds Minialga's testimony that he told Chaney two weeks prior to the shootings that Lutes said he was going to kill Dominick Galliano credible, knowledge of the unique danger posed to the Gallianos is clearly imputable to Seaside Heights and Costello.  While it is true that Costello's denial of ever having been informed of the purported threats and the unavailability of Chaney and Brogan raise hearsay and double hearsay issues, particularly as to the knowledge that

30

can be imputed to Costello[17], this Court need not address those evidentiary issues in the context of the instant motions. The Court finds Minialga's testimony that he informed Chaney sufficient to impute knowledge to both Seaside Heights and Costello without reliance on hearsay, particularly in light of the statements of Mary Jo Pisciotta, former Seaside Heights Deputy Court Administrator, that while in Chaney's office shortly before the shootings she witnessed a discussion between Chaney and Brogan wherein they discussed Lutes' "deteriorating mental condition".

As to Dover Township, Plaintiffs point to the numerous incidents that occurred there that could support a finding that the Galliano family was in a discrete class of persons who were subject to potential harm by Lutes. The Court agrees. While the evidence may be somewhat more tenuous than knowledge of Lutes' threats two weeks prior to the killings, the number and character of the incidents occurring in Dover Township in the years preceding the killings leads the Court to the conclusion that the evidence can support a finding in favor of Plaintiffs as to the third element of the state-created danger test. Indeed, Dover officers were clearly aware of the criminal allegations made by Lutes' daughter against Dominick Galliano and the projections on Lutes' home that "every dad has his day." Moreover, there were the repeated incidents of criminal mischief reported to Dover Township in which the Galliano and Williams families informed Dover officers that they suspected Lutes.

---

[17]     While the Court makes no evidentiary ruling on the instant motions, the Court notes that Plaintiffs' contention that Minialga's testimony regarding Chaney's statement to Costello is not hearsay is incorrect. Plaintiffs' reliance on Fed.R.Evid. 801(d)(2)(A) is misplaced. It is irrelevant that Costello is a party opponent and that Chaney was acting as his agent here where the statement at issue is Chaney's statement that he informed Costello of the threat. Moreover, the Court does not agree that the cited exceptions to the hearsay rule, Fed.R.Evid. 803(1), 803(3), 803(8), 804(3) or 807, would be applicable.

### d.    Creating the Opportunity for Harm

"[U]nder the fourth element of a state-created danger claim, '[l]iability . . . is predicated upon the states' affirmative acts which work to the plaintiffs' detriments in terms of exposure to danger.'" Bright v. Westmoreland County, 443 F.3d 276, 282 (3d Cir. 2006)(quoting D.R. by L.R. v. Middle Bucks Area Vo. Tech. School, 972 F.2d 1364, 1374 (3d Cir. 1992)).  "While we have acknowledged that the line between action and inaction may not always be clear, D.R., 972 F.2d at 1374, we have never found a state-created danger claim to be meritorious without an allegation and subsequent showing that state authority was affirmatively exercised."  Id.

        As this circuit has recently noted

> Failures to act cannot form the basis of a valid § 1983 claim.  See e.g., Bright, 443 F.3d at 283-84 (failure to hold revocation hearing for an individual in violation of his parole prior to his killing an eight-year old girl); [Morse v. Lower Merion School District, 132 F.3d 902, 907-08] (failure to prevent mentally disturbed individual from entering school and attacking teacher); Searles, 990 F.2d at 794 (failure to maintain railcars in a safe condition); D.R. by L.R., 972 F.2d at 1376 (failure of school officials to investigate and stop instances of sexual abuse of students); Brown v. Grabowski, 922 F.2d 1097 (3 Cir. 1990)(failure to file criminal charges against individual who repeatedly threatened and assaulted former girlfriend, despite reports to the police by the victim and her family.)

[Kaucher, supra, 455 F.3d at 433 n.11.]   "It is the misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause."  Bright, supra, 443 F.3d at 282.  "But a specific and deliberate exercise of state authority, while necessary to satisfy the fourth element of the test, is not sufficient.  There must be a direct causal relationship between the affirmative act of the state and plaintiff's harm.  Only then will the affirmative act render the plaintiff 'more vulnerable to danger than had the state not acted at all.'"  Kaucher, supra, 455 F.3d at 432

(quoting Bright, supra, 443 F.3d at 281).  "The fourth element is satisfied where the state's action was the 'but for cause' of the danger faced by the plaintiff."  Id.

Plaintiffs assert that the Defendants knowingly and consciously engaged in affirmative acts to permit Lutes to have and continue to possess the MP-5.  Specifically, Plaintiffs allege:

> They all engaged in acts to deliberately ignore and actively conceal substantial evidence that Lutes was unfit to continue to possess it.  Seaside Heights and Costello permitted Lutes to have unrestricted and unsupervised access to the MP-5.  All defendants were aware of and deliberately ignored or concealed evidence of Lutes' abuse of alcohol and increasingly unstable behavior, and permitted Lutes to continue as a member of the police force and the tactical team without intervention or restriction.  All defendants affirmatively trained Lutes to possess the very proficiencies and tools necessary to carry out the shootings.
> ***
> [T]hese defendants armed Lutes with the tools and the kno-how, all the while knowing he was dangerous and hiding that fact from detection by others.  The record contains substantial evidence that, collectively, these defendants suppressed and covered-up evidence about Lutes' unfitness to possess the MP-5 thereby signaling to Lutes their protection and affirmatively creating the opportunity for the shootings.
> [Plaintiffs' Br. at 60-61.]

Defendants counter that Plaintiffs have failed to allege any affirmative action against them.  According to Defendants, the true nature of Plaintiffs' claims against them is the failure to take action to prevent the harm that ultimately befell the Gallianos.  Citing the recent decision of the Third Circuit in Bright, supra, 443 F.3d 276, and a subsequent decision interpreting Bright, Jiminez v. All American Rathskeller, Inc., 2006 WL 1548874, p. 9, n. 11, Defendants argue that Plaintiffs are foreclosed from relying on a "look the other way" theory of recovery under the fourth element of the state-created danger doctrine.  This Court agrees that this factor does not

33

weigh strongly in favor of the plaintiffs and a "look the other way" policy is indeed insufficient to satisfy the affirmative act requirement under the fourth prong of the state-created danger doctrine.  However, the Court finds that Plaintiffs' allegations go beyond a "look the other way" policy and grating all inferences to Plaintiffs on this motion, there is affirmative conduct by Defendants in the nature of active concealment and in the nature of granting unrestricted access to a submachine gun and other weapons to an officer and regional tactical team member, with knowledge that the officer was experiencing personal problems such as alcohol abuse and involvement in criminal mischief directed toward the ultimate victims.  Additionally, affirmative conduct can be found in Dover Township Patrolman Licata's removal of Lutes' weapons following the incidents of domestic violence and in Seaside Heights Officer Shuldis' removal of Lutes' weapons following his fiancé's funeral, neither of which resulted in any documentation or evaluative action before the weapons were returned to Lutes.  It is the duty of the fact-finder to weigh this evidence.  Hill v. City of Scranton, supra, 411 F.3d 118, 125 (3d Cir. 2005).

### 3.   Municipal Liability

Plaintiffs contend that municipal liability may still be imposed under Monell v. Dep't of Social Services, 436 U.S. 658 (1978) even in the absence of a finding that Lutes was acting under color of state law.  Citing Stoneking v. Bradford Area School Dist., 882 F.2d 720, 724-725 (3d Cir. 1989), Plaintiffs argue that the Third Circuit has adopted the view that municipal liability may exist based upon actions taken by individuals not acting under color of law.  Plaintiffs argue that their claims are not based upon "constitutional entitlement to adequate police services, or protection from the private acts of third parties" as Defendants suggest.  Plaintiffs' Br. at p. 35.  Rather, Plaintiffs contend that there is sufficient credible evidence based upon the facts adduced

during discovery, including the opinions of Plaintiffs' expert, Dr. James O'Keefe, that the Defendants failed to enact and enforce policies, practices and customs to identify police officers and members of the regional tactical team suffering from unusual levels of stress and those that abuse alcohol and to ensure proper safeguarding of special weapons such as the MP-5 submachine gun issued to Lutes in connection with his position on the Central ERT.  In sum, Plaintiffs' municipal liability claims appear rest on allegations that Defendants Seaside Heights, Chief Costello, Dover Township and Ocean County individually and collectively violated the Gallianos' constitutional rights through their unconstitutional customs, policies and practices and (ii) inadequate training and supervision, both of which Plaintiffs allege made Lutes' acts possible.

Although a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents on the theory of *respondeat superior*, an action may be maintained where the execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury. Monell v. Dept. of Social Services, 436 U.S. 658, 698 (1978); Montgomery v. DeSimone 159 F.3d 120, 126-27 (3d Cir. 1998).  The Plaintiff must show that the official policy or custom was the cause of the constitutional violation.  Id., see also, Hansell, supra, 152 F.Supp.2d at 609 (holding that to sustain municipal liability claim under § 1983 based upon unconstitutional policy or custom, plaintiff must demonstrate that "municipal policymakers, acting with deliberate indifference or reckless indifference, established or maintained a policy or well-settled custom which caused a municipal employee to violate plaintiffs' constitutional rights.").   "Municipal liability will only lie where municipal action actually caused an injury."  Grazier v. City of

Philadelphia, 328 F.3d 120, 124 (3d Cir. 2003).  The policy or custom must be "the 'moving

force' behind the constitutional tort."  Hansell, supra, 152 F.Supp.2d at 609.

"A government policy or custom can be established in two ways.  Policy is made when a

'decisionmaker possess[ing] final authority to establish municipal policy with respect to the

action' issues an official proclamation, policy, or edict.  A course of conduct is considered to be a

'custom' when, though not authorized by law, 'such practices of state officials [are] so

permanent and well-settled' as to virtually constitute law."  Beck v. City of Pittsburgh, 89 F.3d

966, 971 (3d Cir. 1996), cert. denied, 519 U.S. 1151, 117 S.Ct. 1086, 137 L.Ed.2d 219

(1997)(citations omitted).  Significantly, "[o]nly those municipal officers and employees who

have final policymaking authority can by their action subject their employers to § 1983 liability."

Burke v. Mahanoy City, 40 F.Supp.2d 274, 284 (E.D.Pa, 1999), aff'd 213 F.3d 628 (3d Cir.

2000), citing Pembaur v. City of Cincinnati, 475 U.S. 469, 479-80, 106 S.Ct. 1292, 89 L.Ed.2d

452 (1986).

"A municipality's failure to properly train its employees and officers can constitute a

'policy' or 'custom' that is actionable under section 1983 'only where the failure to train amounts

to deliberate indifference to the rights of persons with whom the police come into contact.'"

Godley v. Newark Police Department, No. 05-806, 2007 WL 269815 at *5 (D.N.J. Jan. 26,

2007)(quoting Canton v. Harris, 489 U.S. 378, 388 (1989)).   "[T]here must be a deliberate or

conscious choice by the municipality to not train its employees before it may be held liable under

section 1983."  Id.   It is not enough to allege that different training would have been more

effective.  Grazier, supra, 328 F.3d at 125.  "The 'failure to train may amount to deliberate

indifference where the need for more or different training is obvious, and inadequacy very likely

to result in violation of constitutional rights."   Hansell, supra, 152 F.Supp.2d at 610.  In order to prevail on a claim of failure of supervision and training, "plaintiffs must show both 'contemporaneous knowledge' of the allegedly offending incident, or 'knowledge of a prior pattern of similar incidents and circumstances under which a supervisor's inaction could be found to have communicated a message of approval.'"  Id. at 609, (quoting Montgomery v. DeSimone, 159 F.3d 120, 127 (3d Cir. 1998).

When evaluating a municipal liability case, the "proper analysis requires [the Court] to separate two different issues . . . (1) whether plaintiff's harm was caused by a constitutional violation, and (2) if so, whether the city is responsible for that violation."  Collins v. City of Harker Heights, 503 U.S. 115, 120, 112 S.Ct. 1061, 117 L.Ed. 2d 261 (1992).  It is clear that in order to establish municipal liability under either a custom and practice or failure to train and supervise theory, the policy and custom or deliberate indifference must actually inflict the constitutional injury.  See Monell, supra, 436 U.S. at 698.

Examining the facts, as this Court must, in the light most favorable to Plaintiffs, the Court finds that the same evidence that supports Plaintiffs' claims under the state-created danger doctrine supports Plaintiffs municipal liability claims based upon alleged unconstitutional policies and customs and failure to supervise and train.  First, with respect to Plaintiffs' unconstitutional policy and custom claim, the Court finds that in the absence of the Defendants' alleged collective failure to enforce its existing policies or to enact necessary policies, and its practice of engaging in unconstitutional customs, the ultimate harm to the Gallianos could have been averted.

For example, Plaintiffs allege that both Seaside Heights and Dover Township were fully aware of Lutes' alcohol abuse, yet took no evaluative action.  According to the record, in the years immediately preceding the shootings, several reports were made to members of the Seaside Heights Police Department by friends and family members that Lutes had a problem with alcohol.  In fact, Lutes' excessive drinking played a role in the removal of his guns by a fellow officer following his fiancé's funeral, however, no written report in connection with the surrender of weapons was filed.  Additionally, there is Lieutenant Tate's testimony that Costello had remarked to him on one occasion that he was thinking of removing Lutes from membership in the Central ERT due to his drinking.  Yet, as Plaintiffs point out, there is no evidence that Seaside Heights ever referred Lutes for counseling or initiated an internal affairs investigation.

Further, Plaintiffs point to the 2001 accident in which Lutes was issued a summons in Dover Township for careless driving, but never administered a blood alcohol test by the Dover officers responding to the scene, despite reports to those officers that Lutes appeared to be intoxicated.  There are also the reports of Lutes' statements in connection with that accident to a friend that he had been intoxicated but had no fear of being charged because he was a police officer and that he related to his superior, Lieutenant Tate, that he had been drinking prior to the accident.  Additionally, there is 2001 incident in which Dover Township Officer Sulsenti was advised by his superiors that the hazard report he had attempted to file regarding Lutes' drinking problem, would not be filed.

In addition to the proffered evidence of a cover-up regarding Lutes' drinking problem, Plaintiffs point to evidence that both Dover Township and Seaside Heights officials were aware of his unstable behavior toward the Galliano family in the years immediately preceding the

shootings.  Specifically, Plaintiffs point to awareness by Dover Township Officers of the
prominent projections Lutes displayed on his home proclaiming the warning that "every dad has
his day" and the Dover officers' purported failure to properly document numerous reports by the
Williams and Galliano families that Lutes was engaging in a campaign of retaliation against
them.  Moreover, there is evidence that can support a finding that both Chief Costello and Chief
Mastronardy were aware of Lutes' involvement in at least one incident of criminal mischief.[18]
Additionally, Plaintiffs point to Minialga's testimony that he informed Chaney of Lutes' threat
regarding Dominick Galliano two weeks prior to the shootings.

In addition to the above referenced incidents of alleged misconduct or personal problems,
which Plaintiffs claim should have alerted Defendants to the need for intervention, Plaintiffs
present evidence of excessive absenteeism, incidents of domestic violence requiring confiscation
of Lutes' weapons, personal tragedy and financial difficulties, which they claim required some
form of evaluative action by Defendants.  Moreover, Plaintiffs point to the utter failure by
Seaside Heights to have any policy in place regarding the safeguarding of the MP-5 machine gun
purchased for Lutes use in connection with his membership in the Central ERT.

As the Court has previously noted, the evidence alleged is sufficient to support a finding
of liability against Defendants Seaside Heights and Dover Township on a state-created danger
theory of liability.  Viewing the evidence in the light most favorable to Plaintiffs, the Court finds
that the same evidence that supports liability under the state-created doctrine can support a
finding of municipal liability based upon custom and policy.

---

[18]     Chief Costello denies that Chief Mastronardy informed him of the incident prior to the April 2002
shootings, however, Chief Costello's denial clearly creates a disputed issue of material fact.

To the extent Plaintiffs allege municipal liability on a failure to supervise and train theory, the Court's conclusion is the same.  A reasonable jury could find deliberate indifference on the part of both Seaside Heights and Dover Township based on the facts alleged.  The Court is careful to note, however, that any finding of municipal liability based on failure to train or supervise by these Defendants must be premised on the failure to properly supervise and train its supervisory personnel rather than the failure to train Lutes as this Court's finding that Lutes was not acting under color of state law precludes Plaintiffs from premising their municipal liability claim on the failure to train or supervise him.  See Hansell, supra, 152 F.Supp.2d at 610, n.12 (citing Halwani v. Galli, No. Civ. A. 99-1450, 2000 WL 968219 at *4(E.D.Pa. Jul. 13, 2000).

In finding that Plaintiffs have alleged sufficient evidence to sustain a municipal liablity claim against Seaside Heights based upon the failure to supervise and train, the Court recognizes that Lutes was not a member of the Dover Township Police Department, and therefore, Dover Township had no direct supervisory control over Lutes in his capacity as a Seaside Heights Police Officer.   However the Court finds that Plaintiffs have alleged sufficient evidence to nevertheless sustain a claim against Dover Township on this basis given Lutes' involvement with the Central ERT.  It is undisputed that Chief Mastronardy of the Dover Police Department was the designated Chairman of the Leadership Panel for the Central ERT and that the Leadership Panel maintained responsibility for the organization and management of the Central ERT. Moreover, it is undisputed that the Dover ESU was the only team that met the standard to be recognized as a regional team in the Central Region and that Lutes trained solely with the Dover ESU.  Dover Township's contact with Lutes, particularly through Chief Mastronardy's role as Chairman of the Central ERT, may therefore be viewed as supervisory in nature creating an

obligation on the part of Dover Township to implement sufficient policies for the supervision

and training of its supervisory employees to fully investigate and detect members of the Central

ERT suffering from alcohol abuse, violent tendencies or deteriorating mental conditions.

The Court finds, however, that Plaintiffs have failed to state a municipal liability claim

against Defendant Ocean County for the same reasons that Plaintiffs have failed to state a claim

against the County under the state-created danger doctrine.  The Court simply does not find any

agency relationship that would support a finding that knowledge to Seaside Heights could be

imputed to Ocean County.  Moreover, the Central ERT training was conducted by Dover

Township, not Ocean County.  The scant evidence alleged against Ocean County simply does not

support a finding of unconstitutional custom and policy or failure to supervise and train on the

part of Ocean County.

### B.    PLAINTIFFS' CLAIMS AGAINST OCEAN COUNTY

Plaintiffs bring this action against Ocean County on two bases: (i) Lutes' involvement

with the Ocean County regional tactical team, which they claim is under the supervisory control

of the Ocean County Prosecutor's Office; and (ii) the presence of  Sheriff's Officers in the

courtroom during the Galliano criminal trial during which Gail Galliano testified that Dominick

told her that Lutes made a threat on his life.  Ocean County argues that it is entitled to summary

judgment on all counts.

In 1995, the Ocean County prosecutor introduced the Central ERT.  Dover Twp.

Statement of Material Facts ¶ 4.  The goal of the Central ERT was to create standards for

training, personnel, equipment and interagency cooperation throughout the County Emergency

Services Units thereby reducing costs, and increasing their professionalism, efficiency and effectiveness.  Id.

Beginning in 1996, all local emergency services units, including the Dover Township ESU, operated under the Regional Concept Guidelines (also known as the Ocean County Critical Incident Management Plan ("CIMP").  Id. at ¶5.  The CIMP divided Ocean County into three regions: North, Central and South.  Ocean County Stmt. of Material Facts ¶ 38.  Dover Township and Seaside Heights both fell within the Central Region.  Id. at ¶ 39.  Pursuant to the CIMP, organization and management of the Central ERT was "the responsibility of and under the general control of a 3 member panel of Chiefs of Police, appointed by the Ocean County Prosecutor, with a designated chair."  Id. at ¶ 40 (quoting Ex. A, 4).  Chief Michael Mastronardy of the Dover Police Department was designated as the Chairman of the Leadership Panel for the Central Region.  Plaintiffs' Stmt. of Material Facts at ¶82.

Lutes was originally a member of the Seaside Heights ESU, however, due to budgetary constraints and ineffective training facilities, it ultimately disbanded after which Lutes remained a voluntary, part-time member of the Central ERT.   Dover Twp. Stmt. of Material Facts at ¶8.  As of January 1999, the Standard Operating Protocol for the Central Region recognized the Dover Township ESU as the only team that met the standard to be recognized as a regional team.  Ocean County Stmt. of Material Facts at ¶ 53.  Although Lutes could train with any other municipality to receive his ERT certification, he trained with Dover Township ESU.  Dover Twp. Statement of Material Facts at ¶9.

As a result of his membership on the Central ERT, Lutes requested, and the Borough of Seaside Heights Police Department approved, the purchase of a firearm known as an MP-5

42

submachine gun.  Plaintiffs' Stmt. of Material Facts at ¶94.   Lutes received specialized training

and instruction in the use of the MP-5. Id. at ¶100.

Defendant Ocean County seeks summary judgment on the grounds that the County of

Ocean and the Ocean County Prosecutor's Office are two separate and distinct entities.[19]

Defendant Ocean County argues that Plaintiffs' attempt to impose liability on Ocean County for

the alleged failures and/or inactions of the Ocean County Prosecutor's Office in connection with

Lutes' membership in the Central ERT assumes incorrectly that Ocean County is liable for the

actions of the Prosecutor's Office.  Ocean County contends that Plaintiffs' position in this regard

fails to recognize the hybrid status of New Jersey constitutional offices such as the Office of the

County Prosecutor.  Ocean County argues that Lutes' membership in the Central ERT does not

qualify him as an employee of Ocean County or an individual over which the County maintained

day-to-day control.

It is undisputed that in New Jersey county prosecutors have a hybrid status.  Coleman v.

Kaye, 87 F.3d 1491, 1499 (3d Cir. 1996).  The Third Circuit established that, "when county

prosecutors execute their sworn duties to enforce the law. . .they act as agents of the State. On the

other hand, when county prosecutors are called upon to perform administrative tasks unrelated to

their strictly prosecutorial functions. . . the county prosecutor in effect acts on behalf of the

county that is the situs of his or her office."  Id.

Because the Ocean County Prosecutor's Office issued the CIMP administratively

organizing county law enforcement resources to create three regional tactical teams, and because

the CIMP placed a number of responsibilities for supervision of the regional tactical team on the

---

[19]     The Ocean County Prosecutor's Office has never been named a defendant in this action.

Prosecutor's Office, Plaintiffs argue that a jury could reasonably conclude that the regional

tactical teams were county entities, and that Ocean County, through the Ocean County

Prosecutor's Office, bears ultimate responsibility for the administrative oversight of the regional

tactical team.  In light of Lutes' failure to keep current in the training requirements established in

the CIMP, and because agents of the Prosecutor's Office were aware of Lutes' alleged threat to

Dominick Galliano, through Gail Galliano's trial testimony, and Lutes' harassing conduct toward

Community Medical Center employees, Plaintiffs contend that a jury could reasonably conclude

that the County was deliberately indifferent to the constitutional rights of the decedents for all of

the reasons set forth in connection with the claims against the other Defendants.

Ocean County counters that liability against the County simply cannot lie for the actions

of an individual that was not employed by the County, in any capacity, but rather was a full-time

employee of a separate entity.  Ocean County argues that the Prosecutor's Office had absolutely

no day-to-day control over the Central ERT and thus this case cannot be likened to those in

which vicarious liability on the part of the County is imposed based upon the Prosecutor's Office

administrative duties.  The Court agrees.  Indeed, the New Jersey Supreme Court has established

that:

> [W]hen [county] prosecutors perform their law enforcement function, they are
> discharging a State responsibility that the Legislature has delegated to the county
> prosecutors, N.J.S.A. 2A:158-4, subject to the Attorney General's right to
> supersede. The legislative delegation, in combination with the Attorney General's
> supervisory authority and power to superseded, demonstrates that at its essence
> the county prosecutors' law enforcement function is clearly a State function. . . the
> county prosecutor's law enforcement function is unsupervised by county
> government or any other agency of local government, but remains at all times
> subject to the supervision and supersession power of the Attorney General. . .a
> county cannot be held vicariously liable for the actions of prosecutorial defendants
> related to the investigation and enforcement of the criminal laws of the State.

44

> Thus, it follows that when county prosecutors and their subordinates act in their law enforcement/investigatory capacity, they act as "agents" and "officers" of the State.

Wright v. New Jersey, 169 N.J. 422, 462 (2001)(citations omitted). The Court finds that the

Ocean County Prosecutor's Office created the regional tactical teams, and the CIMP that

governed, as part of its prosecutorial function and specifically left the day-to-day administrative

issues to the regional teams.  Thus, the Court finds that summary judgment in favor of Ocean

County is appropriate as there is no basis upon which the County may be held liable for Lutes'

conduct.

The Court similarly finds summary judgment is appropriate as to Plaintiffs' claims

against Ocean County based upon the actions of the Sheriff's Office.  As Ocean County points

out, the only allegation of wrongdoing on the part of the Ocean County Sheriff's Department

concerns the presence of Sheriff's Officers during the criminal trial of Dominick Galliano

wherein Gail Galliano testified as to Lutes' alleged threats against her husband.  Neither of the

two Sheriff's Officers assigned to the courtroom during the Galliano trial had any recollection of

hearing Gail Galliano's testimony regarding the threats.[20]  Dover Twp. Stmt. of Material Facts

Ex. P, 15, 17; Ex. Q, 13.

Although there is no New Jersey case law on point, both Ocean County and Plaintiffs

agree that McMillian v. Monroe County, Ala., 520 U.S. 781 (1997) is instructive on the issue of

whether and under what circumstances Ocean County may be held liable for the conduct of the

---

[20]     Although there is some indication in the record through the testimony and report of Plaintiffs'
expert, Dr. James O'Keefe, that one of the Sheriff's officers indicated that "she was there when Ed Lutes threatened
to shoot Dominick [Galliano]", review of that Sheriff's officer's actual testimony reveals that she had no recollection
of any testimony given during the trial regarding the alleged threat, nor does she provide testimony regarding any
other threat made by Lutes.  It appears that Plaintiffs' expert was mistaken in his testimony and Plaintiffs do not
dispute Ocean County's assertions in this regard in connection with the instant motion.

Sheriff's Department.  The parties therefore agree that Ocean County can only be held liable for

the actions and/or inactions of the Prosecutor's Office and Sheriff's Office when malfeasance is

alleged to have occurred in connection with the day-to-day housekeeping functions of either

entity.

Here, Plaintiffs' claims against the Sheriff's Office appear to rest on their allegation that

the Sheriff's Office "failed in [its] obligation[] to supervise and discipline Lutes as an internal,

administrative, and disciplinary issue."  Plaintiffs Br. at p. 75.  Given this Court's finding that the

Ocean County Prosecutor's Office's creation of the regional tactical teams, implicates its

prosecutorial function, there can be no finding that the Sheriff's officers had any duty to report

testimony regarding Lutes' conduct.   Moreover, the Court notes that Plaintiffs provide no

support for their contention that Sheriff's Officers, charged with the protection of county judges,

courtroom personnel, staff, attorneys, litigants, witnesses and the public in the courtroom, are

also charged with listening and reporting responsibilities in connection with the substantive

testimony given by witnesses during trial.

### C.   CLAIMS AGAINST CHIEF JAMES COSTELLO IN HIS INDIVIDUAL CAPACITY

With regard to the claims against Costello in his individual capacity, Costello contends

that he is entitled to judgment as a matter of law on all claims, and that he is entitled to qualified

immunity from Plaintiffs' § 1983 claims as a matter of law.  The Court recognizes that claims

against officials in their individual capacities are distinct from those against a municipality or

state official in his or her official capacity, however, the Court finds that the same evidence of

alleged acquiescense and deliberate indifference on the part of Costello proffered by Plaintiffs in

46

support of the municipal liability and state-created danger claims is sufficient to support the claims against Costello in his individual capacity.  Moreover, the Court finds that Plaintiffs have raised disputed issues of material fact in connection with Costello's conduct, which preclude the grant of summary judgment on qualified immunity grounds.

Qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); Sharrar v. Felsing, 128 F.3d 810, 826 (3d Cir. 1997); Orsatti v. New Jersey State Police, 71 F.3d 480, 483 (3d Cir. 1995).  The qualified immunity inquiry is a two step process.  "First, [the Court] must determine whether the defendants violated 'clearly established' rights.  This entails a finding of a constitutional or statutory violation as well as a finding that the violated right was clearly established at the time of the violation.  Second, [the court] determine[s] whether a reasonable officer would have believed that his or her conduct deprived the plaintiff of his or her constitutional rights."  Harvey v. Plains Township Police Department, 421 F.3d 185, 192 (3d Cir. 2005)(*internal citations omitted*).  "[T]he burden of pleading a qualified immunity defense rests with the defendant, not the plaintiff."  Thomas v. Independence Twp., 463 F.3d 285, 293 (3d Cir. 2006).

Costello asserts that defining the clearly established constitutional right at issue with the appropriate level of specificity requires the Court in evaluating the availability of qualified immunity to determine "whether a reasonable police chief in Chief Costello's position would have concluded that it constituted deliberate indifference to fail to conclude that officer Lutes was homicidal based on secondhand allegations that he had a drinking problem or was irate, or

generally was suspected of criminal mischief, without any proof."  Costello's Br. at 34.  The

Court rejects Costello's attempt to define the constitutional right so narrowly, as the rights at

issue clearly involve "the right to be free from a state-created danger, the right to be free from a

state-sponsored deprivation of life, liberty or property without the due process of law, the

obligations of police supervisors to supervise and discipline police officers and the requirement

to provide more than [deliberate indifference] to the likelihood that police officers under their

supervision may violate the rights of others or cause them harm."  Plaintiffs' Br. at 89-90.  The

foregoing substantive due process rights alleged by Plaintiffs were clearly established at the time

the conduct giving rise to Plaintiffs' claims took place.  Moreover, the evidence of Costello's

involvement in Plaintiffs' claims arising under the state-created danger doctrine and the

municipal liability theory is adequate to support a finding that Costello violated the Gallianos'

right to substantive due process under Fourteenth Amendment.

Thus, the primary issue with regard to the applicability of qualified immunity concerns

the objective reasonableness of Costello's actions and acquiescence.  As the Court has previously

concluded, however, there are material issues of fact in dispute which relate directly to Costello.

Specifically, there are factual issues concerning Costello's knowledge of Lutes' involvement in

criminal mischief given Chief Mastronardy's testimony that he informed Costello of such matters

as well as factual issues relating to whether knowledge of Lutes' threats two weeks prior to the

shootings may be imputed to Costello in light of Minialga's testimony that he informed Chaney,

the second in command.  Thus, the Court finds summary judgment on qualified immunity

grounds to Chief Costello inappropriate.  See Carswell v. Borough of Homestead, 381 F.3d 235,

242 (3d Cir. 2004)("The jury . . . determines disputed historical facts material to the qualified immunity question.").

### D.    PLAINTIFFS' STATE LAW CLAIMS

In Count Five of Plaintiffs' Amended Complaint, Plaintiffs allege negligence against all municipal Defendants and Chief Costello, based upon negligent hiring, training, retention and supervision.  Plaintiffs raise additional State law claims against the municipal Defendants in Counts Six and Seven alleging wrongful death, and assault and battery and New Jersey State constitutional claims in Counts Eight and Nine.  Because the Court finds that Defendants are entitled to immunity under the New Jersey Tort Claims Act, N.J.S.A. 59:1-1 *et seq*., Defendants motions for summary judgment as to Plaintiffs' state law claims are granted.

Based on the conduct alleged which gives rise to Plaintiffs' state law claims, Dover Township asserts immunity under the New Jersey Tort Claims Act on several grounds.  Dover Township first asserts immunity under N.J.S.A. 59:5-5 in connection with the conduct of its officers in investigating incidents of criminal mischief involving Lutes and when called to the scene of Lutes' automobile accident, arguing that N.J.S.A. 59:5-5 precludes liability based on the failure to arrest Lutes.  Additionally, Dover Township asserts immunity under N.J.S.A. 59:2-3, 3-2(a) and 3-5 arguing that it may not be held liable for the discretionary acts of its officers in failing: (i) to issue a summons to Lutes; (ii) to conduct further investigation; (iii) to arrest Lutes; or (iv) to facilitate Lutes' suspension from the Seaside Heights Police Department or the Central ERT.  According to Dover Township, the immunity afforded to the officers under N.J.S.A. 59:3-2(a) and 3-5, precludes liability as to the Township pursuant to N.J.S.A. 59:2-2(b), which provides that a public entity is not liable for injury resulting from an act or omission of a public

49

employee where the public employee is not liable.  Dover Township also asserts immunity under N.J.S.A. 59:3-3 based upon the discretionary acts of its officers carried out in good faith.  Dover Township asserts the absence of any willful misconduct on the part of its officers that would preclude application of N.J.S.A. 59:3-3 to its officers' discretionary actions.  Finally, Dover Township asserts immunity under N.J.S.A. 59:6-4, 6-5 and 6-6 based upon allegations that it failed to make adequate examination of Lutes' inebriety.[21]

Seaside Heights similarly asserts immunity pursuant to N.J.S.A. 59:3-2 and additionally under N.J.S.A. 59:2-3, arguing that the alleged administrative inaction on its part called for the exercise of personal deliberations and judgment thereby conferring immunity.  Additionally, Seaside Heights asserts immunity for its discretionary actions carried out in good faith, N.J.S.A. 59:3-3, and in connection with the failure to diagnose Lutes with a mental illness, N.J.S.A. 59:6-5, or the failure to confine Lutes in connection with his mental illness, N.J.S.A. 59:6-6.

The State law claims against Costello are limited to negligent hiring, training and retention of Lutes.  Costello argues that the state law claims against him are barred by the notice provisions of the New Jersey Tort Claims Act, N.J.S.A. § 59:8-8.  Additionally, Costello cites to N.J.S.A. 59:3-3, asserting immunity based upon his good faith execution and enforcement of the law, and N.J.S.A. 59:3-5, asserting that he may not be held liable for his adoption of, or failure to adopt, any law or by his failure to enforce any law.  Costello reasons that N.J.S.A. 59:3-3 and 3-5 apply to claims that he failed to do enough to investigate allegations concerning Lutes' emotional problems, as well as his prior alleged instances of intoxication and erratic behavior.  Costello

---

[21]      The immunities conferred by N.J.S.A. 59:6-1 *et seq.* in connection with "mental illness" include alcoholism and intoxication.

also cites to N.J.S.A. 59:5-4 claiming entitlement to immunity based upon his alleged failure to protect against the criminal propensity of a third person.

Plaintiffs counter that no claims are made that any Defendant is liable for injury caused by the failure to make an arrest or to retain an arrested person, nor that any Defendant is liable for failing to adopt a law or enforce any particular law. Thus, Plaintiffs assert, reliance on N.J.S.A. 59:5-5 and 3-5 is misplaced. Next, Plaintiffs argue that N.J.S.A. 59:3-2(a) does not afford immunity to these Defendants because it is limited to discretionary governmental action, which Plaintiffs define to include high level policy decisions involving discretionary acts, rather than ministerial action. Plaintiffs argue that the acts and omissions of the Defendants in this action are simply not the type of high level policy decisions for which immunity exists. Plaintiffs also dispute the application of the good faith immunity afforded by N.J.S.A. 59:3-3 based on their assertion that neither Costello nor any of the municipal officials are entitled to qualified immunity, presumably because disputed issues of fact remain regarding the objective reasonableness of their actions. Finally, Plaintiffs reject Defendants reliance on the immunity afforded by N.J.S.A. 59:6-4, 6-5, and 6-6 arguing that the claims in the instant case have no relation to any failure to render a medical diagnosis or medical treatment that would implicate those provisions.

"The New Jersey Supreme Court has emphasized that '[t]he guiding principle of the Tort Claims Act is that 'immunity from tort liability is the general rule and liability is the exception . . . .'" Soberal v. City of Jersey City, 2006 WL 2085397 (D.N.J. 2006)(quoting Coyne v. State Dept. of Transp., supra, 182 N.J. at 1163). It is well-settled that public entities are afforded immunity for discretionary activities. Pursuant to N.J.S.A. 59:2-3, "(a) a public entity is not

liable for an injury resulting from the exercise of judgment or discretion vested in the entity; (b) a public entity is not liable for legislative or judicial action or inaction or administrative action or inaction of a legislative or judicial nature."  The statutory counterpart for public employees is N.J.S.A. 59:3-2, which provides, in pertinent part, "(a) a public employee is not liable for an injury resulting from the exercise of judgment or discretion vested in him; (b) a public employee is not liable for legislative or judicial action or inaction, or administrative action or inaction of a legislative or judicial nature."

The question, then, is, whether the conduct of the Defendants which gives rise to Plaintiffs' state law claims is encompassed by N.J.S.A. 59:3-2 and N.J.S.A. 59:2-3.  Determining whether governmental action is discretionary for the purposes of the Tort Claims Act, generally depends upon whether the decision is a high level policy decision.  Costa v. Josey, 83 N.J. 49 (1980).  However, "[s]ubsection (b) of N.J.S.A. 59:2-3 'deals with the operational level of decisionmaking and does not implicate high level policymaking decisions."[22]  Bilbili v. Klein, No. 02-cv-2953, 2005 WL 1397016 at * 11 (D.N.J. June 14, 2005)(quoting Denis v. City of Newark, 307 N.J. Super. 304 (App.Div. 1998).   "The sorts of discretionary acts which are covered by subsection (b) are those which 'call[ ] for the exercise of personal deliberations and judgment, which in turn entail[ ] examining facts, reaching reasoned conclusions, and acting on them in a way not specifically directed.'"  Id. (quoting, Berel Co. v. Sencit F/G  McKinley Assocs., 710 F.Supp. 530, 541 (D.N.J. 1989).

---

[22]      Interpretations of N.J.S.A. 59:3-2 are applicable to N.J.S.A. 5:2-3, and vice versa.  See Longo v. Santoro, 195 N.J. Super 507 (App. Div.), certif. denied, 99 N.J. 210 (1984).

The conduct alleged against the individual Seaside Heights and Dover Township Officers, as well as the conduct of Chief Mastronardy and Chief Costello, in connection with Plaintiffs' state law claims involves their respective obligations regarding their investigative, reporting, evaluative, and supervisory duties.  Plaintiffs do not point to any particular policies which required the officers or Chief Mastronardy and Chief Costello to perform in a prescribed manner under a given set of facts, which would implicate ministerial, rather than discretionary activities.  Accordingly, this Court finds that they enjoy immunity under N.J.S.A. 59:2-3(b).  See Bilbili v. Klein, supra, 2005 WL 1397016 at * 11 (finding officials immune from liability arising from disciplinary action taken by defendant officials).  Because the municipal employees would be immune from liability under the Act, the municipalities are immune as well.  See N.J.S.A. 59:2-2(b)("A public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable.").  Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiffs' state law claims.

Additionally, the Court notes that the State law claims against Costello in his individual capacity are barred based upon initial counsel's failure to file a timely Notice of Tort Claims as to Costello.  The New Jersey Tort Claims Act ("NJTCA") sets forth a procedural framework for making claims against public entities and public employees. N.J.S.A. § 59:8-1 et seq.  The NJTCA establishes precise time limitations within which a claim may be brought against public entities and employees. N.J.S.A.§ 59:8-8.  The filing of a notice of claim is a prerequisite to maintaining a suit against a public entity. N.J.S.A. § 59:8-3.  By its terms, the statute requires that a notice of claim be presented no later than ninety days after the accrual of the cause of action. N.J.S.A. § 59:8-8.  Defendant Doyle, against whom Plaintiffs' have asserted a

malpractice action, and Plaintiffs assert that the claim was timely filed as to Defendant Costello. Citing Henderson v. Herman, 373 N.J. Super. 625 (App. Div. 2004), they contend that it is sufficient that the Notice of Tort Claim served on Seaside Heights identified Costello on the list of witnesses.  This Court disagrees.  The facts at issue here are distinguishable from those in Henderson.  The Appellate Court's determination that the Plaintiffs had substantially complied with the notice provision in Henderson was based on the fact that the Plaintiffs had indeed identified the defendant dispatchers in the notice, though not by name.  Here, Costello was simply identified as a witness, and there is no indication that the action was being brought against him.

Because only Plaintiffs' federal claims under § 1983 remain, Plaintiffs' claims for punitive damages fail as well as to the municipal Defendants and Costello, in his official capacity.[23]  See City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981)("a municipality is immune from punitive damages under 42 U.S.C. § 1983").  However, to the extent that Plaintiffs claim that their punitive damages claims remain as to Costello in his individual capacity, the Court finds that because issues of fact remain as to Costello's liability in his individual capacity, summary judgment will not be granted as to the punitive damages claim.

**D.    DEFENDANT NORMAN A. DOYLE, JR., ESQ.'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs' initial counsel, Defendant Norman A. Doyle, Jr., Esq. moves for summary judgment as to Plaintiffs' malpractice claims on the grounds that liability may not attach to his failure to file a Notice of Tort Claim, pursuant to N.J.S.A.  59:8-8, in connection  with the claims

---

[23]    Plaintiffs concede that punitive damages are not recoverable against a municipality for claims brought under 42 U.S.C. § 1983.

brought on behalf of the Estate of Christopher Galliano.  Plaintiffs cross-move for summary

judgment as to Defendant Doyle's liability for failure to timely file the Notice of Tort Claim on

behalf of the Estate of Christopher Galliano and impliedly in connection with Doyle's failure to

file a Notice of Tort Claim as to Defendant Costello.  Because the Court grants summary

judgment as to Plaintiffs' state law claims on immunity grounds, Doyle's motion and Plaintiffs'

cross-motion concerning issues related to Doyle's alleged malpractice in failing to file a timely

the Notices of Tort Claim in connection with Plaintiffs' state law claims are moot.   Accordingly,

Doyle's motion is granted and Plaintiffs' cross-motion is denied.


**IV. CONCLUSION**

        For the reasons discussed herein, the court DENIES the motions for summary judgment

filed on behalf of Seaside Heights, Chief Costello, and Dover Township as to Plaintiffs' claims

under 42 U.S.C. § 1983 and GRANTS the motions as to Plaintiffs' state law claims.  The Court

GRANTS Defendant Ocean County's motion for summary judgment.  The Court further

GRANTS Defendant Doyle's motion for summary judgment in connection with the legal

malpractice action against him and DENIES Plaintiffs' cross-motion.  An appropriate order will

follow.


        Dated: March 30, 2007                            /s/ Freda L. Wolfson
                                                         Honorable Freda L. Wolfson
                                                         United States District Judge